IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MANNU SINGH and IAGON AS, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>ILLUSORY SYSTEMS, INC.; ARCHETYPE CRYPTO II, LLC; ETHEREAL VENTURES I PARTNERS L.P.; CONSENSYS MESH; CONNEXT LABS, INC.; COINBASE, INC.; OZONE NETWORKS, INC.; POLYCHAIN ALCHEMY, LLC; CIRCLE INTERNET FINANCIAL, LLC,<br><br>*Defendants.* | C.A. 23-183-RGA |

### KEYHOLDER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

OF COUNSEL:

DONTZIN NAGY & FLEISSIG LLP
Tibor L. Nagy Jr.
Gregory N. Wolfe
Matthew D. Gauthier
980 Madison Avenue
New York, NY  10075
(212) 717-2900
tibor@dnfllp.com
greg@dnfllp.com
mgauthier@dnfllp.com

ABRAMS & BAYLISS LLP
Michael A. Barlow (#3928)
20 Montchanin Road, Suite 200
Wilmington, DE 19807
(302) 778-1000
barlow@abramsbayliss.com

*Attorneys for ConsenSys Mesh
and Ethereal Ventures I Partners L.P.*

OF COUNSEL:

COOLEY LLP
Bethany C. Lobo
3 Embarcadero Center
20th Floor
San Francisco, CA  94111
(415) 693-2187
blobo@cooley.com

Rebecca L. Tarneja
355 S. Grand Avenue
Suite 900
Los Angeles, CA  90071
(213) 561-3225
rtarneja@cooley.com

SHAW KELLER LLP
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for Archetype Crypto II, LLC*


OF COUNSEL:

LATHAM & WATKINS LLP
Serrin Turner
Gregory Mortenson
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
serrin.turner@lw.com
gregory.mortenson@lw.com

Jack McNeily
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
jack.mcneily@lw.com

RICHARDS, LAYTON & FINGER, P.A.
Jeffrey L. Moyer (#3309)
Nathalie A. Freeman (#7053)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
freeman@rlf.com

*Attorneys for Connext Labs, Inc.*

Dated: September 13, 2023

## <u>TABLE OF CONTENTS</u>

**SUMMARY OF THE ARGUMENT** ....................................................................... 1

**ARGUMENT** ............................................................................................................... 2

I.  PLAINTIFFS' OPPOSITION DOES NOT RESUSCITATE THEIR DEFICIENT RICO CLAIMS ......... 2

    A.  Plaintiffs Have Inadequately Alleged Predicate Acts Against Any Defendant......... 2

        1.  Illicit Money Transmissions Under Section 1960 Require Receipt Of A Fee; Plaintiffs Misrepresent *Murgio* In Arguing Otherwise ............................ 2

        2.  Plaintiffs Do Not Dispute Their Failure To Plead False Statements By The Keyholders And Circle, Which Defeats Wire Fraud As To Them .................. 4

        3.  Any Solicitations By Illusory Were Necessarily Immaterial............................ 4

    B.  Plaintiffs Have No Response For The Intervening Acts That Defeat Causation....... 6

    C.  Plaintiffs' Allegations Do Not Tie Their Injury To The United States ..................... 8

    D.  *Zavala* Properly Interprets The Distinctiveness Requirement.................................. 9

    E.  There Is No Allegation The Keyholders Conducted The Enterprise's Affairs........ 10

    F.  The Interruption To Illusory's Business Defeats Continuity.................................. 10

II.  PLAINTIFFS' OPPOSITION CANNOT RESUSCITATE THEIR CONSPIRACY CLAIM.................. 11

III.  PLAINTIFFS' OPPOSITION CANNOT RESUSCITATE THEIR NEGLIGENCE CLAIM.................. 11

    A.  Plaintiffs Have No Answer For The Economic Loss Rule And *Xat.com*................ 11

    B.  Plaintiffs' Negligence *Per Se* Arguments Are Frivolous......................................... 13

    C.  There Is No Duty Under Ordinary Negligence Principles....................................... 13

IV.  THE OPPOSITION CANNOT RESUSCITATE THE CONVERSION CLAIMS ............................... 15

**CONCLUSION** ........................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Bank of Com. v. Seely*,
    23 Utah 2d 271 (1969) ..........................................................................................12

*Boynton v. Kennecott Utah Copper, LLC*,
    2021 UT 67 ............................................................................................................14

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999) ..................................................................................6

*In re Cap. One*,
    488 F. Supp. 3d 374 (E.D. Va. 2020) ..................................................................12

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) ...............................................................................................9

*Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*,
    2016 WL 5243950 (Del. Ch. Sept. 22, 2016) ........................................................5

*Chinitz v. Ally Bank*,
    2020 WL 1692817 (D. Utah Apr. 7, 2020) ..........................................................13

*Donner v. Nicklaus*,
    778 F.3d 857 (10th Cir. 2015) .....................................................................1, 12, 14

*Fabian v. LeMahieu*,
    2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) ........................................................13

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,
    482 F.3d 247 (3d Cir. 2007) ..................................................................................3

*Hall v. Warren*,
    632 P.2d 848 (Utah 1981) ................................................................................2, 13

*Hindes v. Castle*,
    937 F.2d 868 (3d Cir. 1991) ................................................................................10

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ...............................................................................................6

*Humphrey v. GlaxoSmithKline*,
    905 F.3d 694 (3d Cir. 2018) ...............................................................................8, 9

*In re Ins. Brokerage Antitrust Litig.*,
    2017 WL 3642003 (D.N.J. Aug. 23, 2017) ...................................................................6

*Iotex Commc'ns, Inc. v. Defries*,
    1998 WL 914265 (Del. Ch. Dec. 21, 1998)................................................................10

*Ipsen v. Diamond Tree Experts, Inc.*,
    2020 UT 30 ................................................................................................................12

*B.R. ex rel. Jeffs v. West*,
    2012 UT 11 ................................................................................................................14

*Labreck v. Bank of Am., N.A.*,
    2018 WL 6427717 (D. Del. Dec. 7, 2018)...................................................................5

*Longmont United Hosp. v. St. Barnabas Corp.*,
    305 Fed. Appx. 892 (3d Cir. 2009)...............................................................................7

*McBrearty v. Vanguard Grp., Inc.*,
    2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 F. App'x 640 (2d Cir. 2009)...............6

*Sarcuni v. bZx DAO*,
    2023 WL 2657633 (S.D. Cal. Mar. 27, 2023) ..........................................................13

*Se. Directional Drilling, LLC v. Kern River Gas Transmission Co.*,
    2013 WL 209492 (D. Utah Jan. 17, 2013)................................................................13

*St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*,
    967 F.3d 295 (3d Cir. 2020)........................................................................................6

*Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris*,
    171 F.3d 912 (3d Cir. 1999)........................................................................................8

*In re Target Corp.*,
    64 F. Supp. 3d 1304 (D. Minn. 2014)..................................................................14, 15

*Turkish v. Kasenetz*,
    27 F.3d 23 (2d Cir. 1994)............................................................................................5

*U.S. v. Ali*,
    561 F. Supp. 2d 269 (E.D.N.Y. 2008) .........................................................................2

*U.S. v. Han*,
    637 F. Supp. 3d 527 (N.D. Ill. 2022) ..........................................................................2

*U.S. v. Murgio*,
    209 F. Supp. 3d 698 (S.D.N.Y. 2016)......................................................................1, 3

*U.S. v. Richter*,
    796 F.3d 1173 (10th Cir. 2015) ...................................................................5

*U.S. v. Rodriguez*,
    732 F.3d 1299 (11th Cir. 2013) ...................................................................5

*U.S. v. Singh*,
    995 F.3d 1069 (9th Cir. 2021) .....................................................................2

*U.S. v. Velastegui*,
    199 F.3d 590 (2d Cir. 1999).....................................................................3, 6

*U.S. v. Wellington*,
    2022 WL 3345759 (D.N.M. Aug. 12, 2022) ...............................................2

*Walther v. Patel*,
    2011 WL 382752 (E.D. Pa. Feb. 4, 2011) ...................................................9

*Xat.com v. Hosting Servs.*,
    2017 WL 449652 (D. Utah Feb. 2, 2017) ..............................................1, 11, 12, 14

*Yegiazaryan v. Smagin.*,
    143 S. Ct. 1900 (2023)...........................................................................8, 9

## STATUTES

N.Y. Banking Law § 640(4) ..................................................................................7

N.Y. Banking Law § 643 ......................................................................................7

N.Y. Banking Law § 653(6) ..................................................................................7

U.C.A § 7-25-102(9)(b) ......................................................................................13

## OTHER AUTHORITIES

FFIEC BSA/AML Examination Manual, https://bsaaml.ffiec.gov/manual....................................7

FinCen Guidance, Application of FinCEN's Regulations to Certain Business Models Involving
    Convertible Virtual Currencies, Fin-2019-G001, May 9, 2019.................................7

## SUMMARY OF THE ARGUMENT

Plaintiffs'[1] scattershot opposition briefs and purported "belief" that the Bridge—a free, developmental software product—would be "hack-proof" cannot save their deficient RICO and common law claims.[2] Plaintiffs pervasively misstate their allegations and the law—most glaringly through the use of brackets to flat out rewrite *U.S. v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016), to claim the court rejected a fee requirement in Section 1960, which is false.  *See* p. 3, *infra*.

The RICO claim fails for multiple reasons, including, among others, that:

- **No predicate act is pleaded.**  Circuit and district courts across the country are uniform that a money transmitter does not violate Section 1960 unless it receives a fee for processing transactions, which Illusory undisputedly did not.  Moreover, Plaintiffs do not contest that no allegedly false statements were made by the Keyholders and Circle, as needed to sustain the wire fraud acts, which are in any event based on immaterialities.

- **Proximate causation is not pleaded.**  Plaintiffs have no answer to the four intervening causes of their alleged harm and cannot show that either of the alleged predicate acts was the direct cause of their injuries.  Indeed, they have not identified a single data breach case that was contorted into a successful RICO claim with good reason: in such cases, intervening, non-RICO acts cause the harm, as they did here, which breaks causation.

- **Plaintiffs' injury is not domestic.**  Plaintiffs, both foreign, point to *Defendants*' ties to the U.S., but make no effort to tie *their injury* to the U.S., which is fatal.

The common law claims also fail.  Plaintiffs have no answer for Utah's broad economic loss rule and *Xat.com v. Hosting Servs.*, 2017 WL 449652 (D. Utah Feb. 2, 2017), which rejected tort claims in a materially identical hack case.  Instead, Plaintiffs cite to economic loss rule and data hack cases *outside* of Utah, which are not relevant.  *Donner v. Nicklaus*, 778 F.3d 857, 874 (10th Cir. 2015) (rejecting relevance of out-of-state economic loss rules).  To advocate for

---

[1] Capitalized terms have the meanings ascribed in the Keyholders' Opening Brief ("Op.").  All emphases have been added unless otherwise noted.

[2] In disregard of this Court's orders regarding page limits (*see* D.I. 55), Plaintiffs devote 35 pages to their direct RICO claims and smuggle their arguments on the common law claims into their opposition to Illusory's opening brief.  We join in the Investor and Illusory replies in full.

negligence *per se*, they cite *Hall v. Warren*, but disingenuously omit the same court's observation that negligence *per se* applies *only* in cases involving "*dangerous instrumentalities*," 632 P.2d 848, 851 n.1 (Utah 1981), and they likewise omit that Utah's money transmitter statute does not apply to cryptocurrencies.  *See* p. 13, *infra*.  Because its defects are incurable, as confirmed by Plaintiffs' failure to attach a proposed amended pleading, the FAC should be dismissed with prejudice.

## ARGUMENT

I.   **PLAINTIFFS' OPPOSITION DOES NOT RESUSCITATE THEIR DEFICIENT RICO CLAIMS**

   A.   **Plaintiffs Have Inadequately Alleged Predicate Acts Against Any Defendant**

      1.   Illicit Money Transmissions Under Section 1960 Require Receipt Of A Fee; Plaintiffs Misrepresent *Murgio* In Arguing Otherwise

As explained in our Opening (at 12–13), and as the Second, Fourth, and Ninth Circuits and district courts across the country, including in this Circuit, have observed, a defendant operates an unlicensed "money transmitting business" in violation of Section 1960 *only* if it receives a "*fee*" for transmitting money.  *E.g.*, *U.S. v. Singh*, 995 F.3d 1069, 1077 (9th Cir. 2021).  Plaintiffs claim the fee requirement in these cases is illustrative, not mandatory.  RICO Resp. at 2, 10–11.  Plaintiffs are wrong: just last year, in assessing the sufficiency of an indictment, one court held, in reliance on Second and Ninth Circuit decisional law, that "the receipt of a fee is a fact required to prove a business under" Section 1960.  *U.S. v. Wellington*, 2022 WL 3345759, at *8 (D.N.M. Aug. 12, 2022).  Also last year, in reliance on the same law, another court sustained a conviction because the evidence allowed the jury to infer the defendant was receiving "*fees*," not "*transferring strangers' money for free*," which would have been insufficient.  *U.S. v. Han*, 637 F. Supp. 3d 527, 545 (N.D. Ill. 2022).  The fee requirement is needed because Section 1960 would otherwise not "delineate[] a zone of prohibited conduct with much clarity" and be susceptible to indefiniteness challenges.  *U.S. v. Ali*, 561 F. Supp. 2d 269, 272 & n.3 (E.D.N.Y. 2008) (observing Second Circuit

in *U.S. v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999) addressed issue by interpreting Section 1960 to have, among other things, a fee requirement).  Plaintiffs cite no case on the other side.

Plaintiffs mischaracterize *Murgio* as "the only court to directly consider the issue" and then, through the use of brackets, nakedly rewrite the opinion to claim *Murgio* found "no authority suggesting that the Court must read a 'profit' *[–let alone a fee–]* requirement into" Section 1960. RICO Resp. at 2, 10–11 (purporting to quote *Murgio*).  Properly quoted, *Murgio* did not address, let alone reject, the fee requirement; rather, *Murgio* held that there was no *profit* requirement in Section 1960, but even if there was, the indictment satisfied it by alleging receipt of a *fee*:

> It is unclear from Murgio's brief whether he believes that the Government must allege a "profit" element in order to charge Murgio under § 1960.  If that is in fact Murgio's position, it is unavailing. Murgio points to no authority suggesting that the Court must read a "profit" requirement into § 1960, and *even if such a requirement existed, the allegation that Coin.mx "charg[ed] a fee for [its] service" would be sufficient*.

*Murgio*, 209 F. Supp. 3d at 711 (no words changed).[3]  Plaintiffs are left with the pure speculation that Illusory may charge a fee at some point in the future, which is insufficient to plead a criminal violation, as is the speculation that Illusory would not have obtained requisite licenses if it began charging fees.[4]  Because Illusory received no fee, Plaintiffs' Section 1960 theory fails.

---

[3] The holding in *Murgio* was responsive to Murgio's meritless argument in his motion to dismiss that Section 1960 includes a "profit" requirement but that his business was merely alleged to have received a "fee."  *See* Wolfe Decl., Ex. 1 at 14.  Plaintiffs also falsely claim that the court in *Murgio* "survey[ed] the law" (RICO Resp. at 10), but *Murgio* did not cite any authority on the fee requirement, let alone that purported to reject it.  209 F. Supp. 3d at 711.

[4] In a footnote (*see* RICO Resp. at 11 n.3), Plaintiffs concede that they have not alleged, but claim they can allege, that Connext charged fees in connection with transmissions on a separate bridge that Connext independently operated (the "Connext Bridge").  To seek leave to amend, however, Plaintiffs were required to "submit[] a draft amended complaint."  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252–53 (3d Cir. 2007).  Moreover, it is sophistry to suggest that fees allegedly charged by Connext could somehow satisfy the fee requirement for the

2.    <u>Plaintiffs Do Not Dispute Their Failure To Plead False Statements By The
Keyholders And Circle, Which Defeats Wire Fraud As To Them</u>

Plaintiffs claim all "Nomad Defendants were fully aware" of weaknesses in Bridge security

(RICO Resp. at 15) but do not contest—and thus concede—that they have "fail[ed] to identify a

single false communication by Circle or any of the Keyholders," which "is insufficient to allege

that [they] committed a single predicate act of wire fraud." Op. at 11–12. Because the Section

1960 allegations are insufficient—and because it is undisputed that a RICO claim can only survive

if at least two predicate acts are pleaded as to each defendant—the claims must be dismissed. *Id*.

3.    <u>Any Solicitations By Illusory Were Necessarily Immaterial</u>

In any event, Plaintiffs' wire fraud case boils down to three alleged overstatements that

Plaintiffs claim amounted to a guarantee by Illusory that Watchers would prevent fraud, one in a

tweet, one in the White Paper, and the final in a press release issued five days before the hack,

*after* Plaintiffs were allegedly deceived. *See* RICO Resp. at 15–17 (citing FAC ¶¶ 72, 75, 80).[5]

These alleged overstatements do not plausibly state material misrepresentations, a scheme

to defraud, or fraudulent intent in light of the TOU, License, and publicly available information

disclosing the exact opposite, namely, that Bridge security was not guaranteed. There is no dispute

that Singh, like most users, entered into the TOU to use the Bridge, which made clear there was

no guarantee the Bridge would be "secure." Op. at 15. The License likewise provided that Iagon

---

unrelated *Nomad Bridge*, let alone that such activity on the Connext Bridge could have been a but-
for cause of Plaintiffs' alleged injuries suffered due to a hack on the Nomad Bridge.

In the same footnote, Plaintiffs also argue the "conspiracy count can proceed even without
proof of *prior* fees," which is frivolous: there is no dispute that if the FAC fails to plead an
underlying Section 1962(c) claim, then the Section 1962(d) claims must be dismissed. *See* Op. at
20; Section II, *infra*; Investor Reply at 6–7.

[5] Plaintiffs do not seriously dispute that the bulk of the alleged misrepresentations (*e.g.*, the Bridge
is the "most secure way to bridge assets" with a "model ... predicated on being able to offer enough
security") constitute inactionable puffery. *See* Op. at 9–10, 13–14. And Plaintiffs concede their
allegations of security features to "be implemented in the future" are inactionable. *Id.* at 14–15.

was using the Bridge's code at its sole "risk," subject to a broad limitation of liability.  *Id.* at 22.

To try to get around their contracts, Plaintiffs claim "classic fraudulent inducement" (RICO Resp. at 18)—an allegation outside the FAC that must be disregarded.  *Labreck v. Bank of Am., N.A.*, 2018 WL 6427717, at *4 (D. Del. Dec. 7, 2018).  Any fraudulent inducement claim would be meritless given the contractual representations that "contradicted" any extracontractual representations.  *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *6–7 (Del. Ch. Sept. 22, 2016); *see also* Op. at 15–16.  Even Plaintiffs concede a misrepresentation cannot be material if it puts the plaintiff "on notice that specific transactions are possible" (RICO Resp. at 19), as the TOU did by disclosing the possibility of a hack.  While Plaintiffs complain that their contracts did not specifically mention the Watchers, the disclosures that they could not rely on any part of the Bridge's security apparatus are dispositive.  Further, Plaintiffs have no good answer for the "contradictory warnings in the White Paper and the Quantstamp Audit."  Op. at 15. The White Paper couched its discussion of the Watchers by making clear that they "minimize[d]" (not eliminated) "the chances of fraud" and that "Permissionless Watchers" were still under development, as were other security features.  Wolfe Decl., Ex. 2; Op. at 13–14.  Before the hack, the Quantstamp Audit publicly highlighted weaknesses in security.  Op. at 5–6, 15.  These public warnings vitiate any plausible inference of materiality or of a scheme or intent to defraud.

Plaintiffs' cases are distinguishable.  *U.S. v. Richter*, 796 F.3d 1173, 1193 (10th Cir. 2015) has no relevance, as it only addressed whether a deprivation of property can be a RICO injury. *Turkish v. Kasenetz*, 27 F.3d 23, 27 (2d Cir. 1994) found that a generic limitation of liability could not disclaim fraudulent inducement grounded in contractual misrepresentations; here, there is no fraudulent inducement pleaded and the alleged fraud is extracontractual and contrary to the specific contractual provisions.  Unlike here, the misrepresentations and schemes in *U.S. v. Rodriguez*, 732

F.3d 1299, 1304 (11th Cir. 2013) and *In re Ins. Brokerage Antitrust Litig.*, 2017 WL 3642003, at *7 (D.N.J. Aug. 23, 2017) were not undercut by the contracts and publicly available information.

**B.      Plaintiffs Have No Response For The Intervening Acts That Defeat Causation**

Plaintiffs make no attempt to address the four intervening causes that break the chain of proximate causation, which is fatal to their RICO claim.  *See* Op. at 16–18.  Plaintiffs do not dispute that each intervening act—the mistake in the code, the initial hack by an unknown malicious actor, the follow-on hacks by copycats, and the failure of non-party Watchers to halt the attacks—constitutes a non-RICO racketeering act that cannot sustain proximate causation.  *See id.*

Plaintiffs try to argue (RICO Resp. at 20–21) that they satisfied the three *Holmes* factors "for assessing directness," as described in *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, so proximate causation is met.  967 F.3d 295, 300–03 (3d Cir. 2020).  Plaintiffs omit that, as *St. Luke's* observed, "a more direct victim of the purported violation *or* independent, intervening factors may also break the chain of causation."  *Id.* at 301, 303 (proximation causation sufficient because "no 'independent factors . . . account[ed] for [the plaintiffs'] injury . . . *and* no more immediate victim [was] better situated to sue").  While meeting the *Holmes* factors may be necessary to allege proximate causation, it is not sufficient.[6]  *See McBrearty v. Vanguard Grp., Inc.*, 2009 WL 875220, at *4 (S.D.N.Y. Apr. 2, 2009) (rejecting reliance on "*Holmes* factors" as "miss[ing] the point . . . [b]ecause intervening events . . . proximately caused" the harm), *aff'd*, 353 F. App'x 640 (2d Cir. 2009) (same).  Here, intervening, non-RICO events break causation.

---

[6] In any event, the *Holmes* factors do not aid Plaintiffs.  With respect to the first factor, the presence of intervening causes "make[s] it difficult to ascertain the amount of" their "damages attributable to the violation, as distinct from other, independent factors."  *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 269 (1992).  With respect to the third, Plaintiffs' true complaint is not that Illusory engaged in the money laundering Section 1960 was designed to punish.  *See Velastegui*, 199 F.3d at 593.  Rather, it is that Illusory did not comply with licensing regimes, for which federal and state governments "more generally are in a position to vindicate the public interest in the sense set forth in *Holmes*."  *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 266 (3d Cir. 1999).

As the Opening (at 16–17) also established, Plaintiffs have failed to show that either predicate act was even a plausible link to their harms—stolen assets—which provides another basis to reject the claims. With respect to Section 1960, Plaintiffs argue "the unlicensed operation" of the Bridge "caused" them to "deposit their assets" on the Bridge (RICO Resp. at 22), but never explain why that is so beyond the reductive allegation that the Bridge was "only" able to operate because it did not have requisite licenses. FAC ¶¶ 100–01. Plaintiffs also turn to a grab bag of unsupported assertions outside the FAC about the potential for regulatory oversight to prevent their harms (RICO Resp. at 22–25), which cannot be considered on this motion. Even if considered, the theory would impermissibly depend on speculation regarding the actions of government actors.[7] *See Longmont United Hosp. v. St. Barnabas Corp.*, 305 Fed. Appx. 892, 895 (3d Cir. 2009) (no proximate causation where "government discretion played a significant role" in causal chain). More significantly, Plaintiffs never plausibly explain how an improved compliance program would have prevented a coder from introducing a "simple mistake" into the Bridge's code

---

[7] The compliance programs Plaintiffs cite are not even remotely applicable to this case. Plaintiffs rely on the entire BSA/AML Examination Manual, which is applicable to "*banking organization[s]*," not a cryptocurrency bridge. https://bsaaml.ffiec.gov/manual/Introduction/01. Plaintiffs also cite FinCEN guidance, which speaks to a "culture of compliance" in record keeping, anti-money laundering, and KYC matters, not coding. https://perma.cc/A6B8-JQTJ at 9.

Plaintiffs cite New York's money transmission law; but, as the Opening explained (at 13 n.7), there is no allegation why Illusory, a Utah company, would need to register in New York, as there is no alleged connection to New York. Even if Illusory did, Plaintiffs' allegation is that Illusory's license would have "almost certainly been denied" and accordingly that it would not have been subject *to any oversight in New York*. FAC ¶ 100. At most, that would mean Illusory could not provide services to New York residents, which would not affect Plaintiffs because they are foreign. In any event, as explained above, there is no plausible explanation for why any New York examination could have possibly averted the harm.

Any New York bond would not aid Plaintiffs. Plaintiffs rely on N.Y. B.L. § 643, which governs the posting of a bond for the benefit of the State of New York for purchasers and holders of "New York instruments." Cryptocurrencies are not covered under that law, and, even if they were, Plaintiffs do not allege their assets were "*sold in New York*," as required to be New York instruments. *See id.* §§ 640(4), 653(6). In any event, it is speculative that New York would decide any bond should benefit Plaintiffs given that they and their assets have no New York connection.

(in particular if it were *intentionally* introduced), stopped a "malicious actor" and "copycats" from exploiting that mistake, or somehow ensured that the Bridge's security apparatus would avert the attacks.[8]  FAC ¶¶ 61, 87.  Such "speculati[on]" cannot support a RICO claim.  *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 932 (3d Cir. 1999).

With respect to wire fraud, Plaintiffs have not even pleaded but-for causation under Rule 9(b).  Op. at 15 n.8, 17.  Singh includes only the bald allegation of reliance, which is not enough. While Iagon claims it asked "multiple questions . . . regarding security" (RICO Resp. at 27), the only statement it allegedly relied on was whether the Bridge was non-custodial, which is unrelated to security.  Such allegations are insufficient to show reliance, as required to establish causation.

In any event, Plaintiffs have no answer for the multiple intervening non-RICO acts that break the chain of causation for both alleged predicate acts, which defeats the RICO claim.

### C.  Plaintiffs' Allegations Do Not Tie Their Injury To The United States

Plaintiffs' RICO claims must be dismissed because they fail to allege a domestic injury. *See* Op. at 10–11.  Plaintiffs are wrong that the Opening did not apply the contextual test for domestic injury set forth in *Yegiazaryan v. Smagin*.  There, the Supreme Court expressly affirmed the Third Circuit's contextual test for domestic injury in *Humphrey v. GlaxoSmithKline*, 905 F.3d 694 (3d Cir. 2018), the same test and case the Opening relied upon.  *See* 143 S. Ct. 1900 (2023).

While Plaintiffs point to *Defendants'* ties to the United States (*see* RICO Resp. at 28–29 (citing FAC ¶¶ 7, 8, 11–15, 72–83)), they do not allege that either foreign *Plaintiff* suffered any

---

[8] Plaintiffs' allegations are inconsistent, but they now appear to rely on the notion that the error was introduced intentionally, and the proceeds stolen by someone who worked for the "Nomad Enterprise."  RICO Resp. at 26.  Plaintiffs do not explain why this matters, as non-RICO acts still caused Plaintiffs' harm.  Moreover, there is no plausible allegation that the actor actually did so to benefit the alleged enterprise, meaning the actor's acts were outside the scope of employment.  *See* Op. at 29–30.  And if the error in the code were maliciously introduced, it would be even more speculative to suggest that an overridden compliance program could have prevented the harm.

injury in the United States, *see* FAC ¶¶ 105–24 (describing the harm allegedly suffered by Plaintiffs). That is insufficient under the contextual test. Unlike in *Yegiazaryan*, where the court found the plaintiff was directly injured in California because he held a California judgment and the defendant acted with the aim and effect of subverting the right to execute on the judgment in California, 143 S. Ct. at 1910–11, Plaintiffs here fail to plead that they had any property or business in the United States, that they were injured in the United States, or that the aim and effect of the alleged RICO enterprise was to harm them in the United States. Rather, this case resembles *Humphrey*, where the Third Circuit held the contextual test for domestic injury was not satisfied where the plaintiffs' business was entirely conducted in China, and the plaintiffs did not allege that they had offices, assets, or other property in the United States. 905 F.3d at 707. As in *Humphrey*, the alleged injury is not domestic, meaning the case must be dismissed.

### D.   *Zavala* Properly Interprets The Distinctiveness Requirement

In line with Judge Greenaway's analysis in *Zavala*, courts generally dismiss claims where the alleged RICO entities or individuals also constitute the alleged enterprise without participation from another, non-RICO entity or individual. *See* Op. at 19 (collecting cases). Although Plaintiffs cite decisions that have come out the other way (*see* RICO Resp. at 29–31),[9]  by requiring some daylight between the members of the enterprise and RICO persons, *Zavala* and its progeny are better-reasoned and faithful to Supreme Court precedent. Otherwise, Section 1962(c) claims would risk capturing conduct that is truly the affairs of each defendant, as opposed to an enterprise. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001). This is the case here, where Plaintiffs have attempted to turn the Nomad Bridge—a protocol comprising lines of code run and

---

[9] Plaintiffs' case *Walther v. Patel*, 2011 WL 382752, at *4 & nn. 56–57 (E.D. Pa. Feb. 4, 2011), seriously overstates the "weight of the authority" on the other side of the ledger, as nearly all of the decisions *Patel* cites were decided before the clarification of the law by the Supreme Court in *Cedric Kushner Promotions*.

developed by Illusory accessible through a website operated by Illusory—into a RICO enterprise.

### E. There Is No Allegation The Keyholders Conducted The Enterprise's Affairs

Plaintiffs fail to rebut that the Keyholders have not "conducted or participated in the conduct of the enterprise's affairs, not just their own affairs." Op. at 20. It is undisputed that the only the alleged business of Illusory was the Bridge. And Plaintiffs' conclusory claim that the Keyholders are necessary to the functioning of the Bridge is contradicted by the allegations: while the FAC alleges that the Keys (*i.e.*, authenticators) were needed to make changes to the Bridge's software, there is no allegation that the Bridge could not function without their input. Likewise, even if Plaintiffs were correct that the Keyholders could have, through several technological steps, somehow seized possession of digital assets on the Bridge, the Keyholders are not alleged to have ever done so. The TOU was explicit that the Bridge was "non-custodial," meaning that Plaintiffs— not even Illusory, the Bridge's operator—retained control over their assets. *See* TOU § 6.1. Plaintiffs' RICO claims accordingly fail.

### F. The Interruption To Illusory's Business Defeats Continuity

Plaintiffs do not dispute—and thus concede—that if the Section 1960 allegations are insufficient, then the handful of purported "wire fraud" acts are insufficient to allege continuity. Op. at 19 n.9. Nor have Plaintiffs shown open-ended continuity as to the alleged money transmissions, as it has been over a year since the Bridge operated, there is no sign it will restart, and Illusory attempted to return all funds to its users. Against this, Plaintiffs rely on out-of-circuit cases to argue open-ended continuity is determined at the time the alleged predicate acts occurred and the "fortuitous interruption" of an alleged scheme is irrelevant. That is not the law in the Third Circuit, where continuity can be defeated by fortuitous interruptions, such as by plaintiffs uncovering the scheme, *see Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *2 (Del. Ch. Dec. 21, 1998), or the scheme succeeding, *see Hindes v. Castle*, 937 F.2d 868, 874 (3d Cir. 1991).

## II.    PLAINTIFFS' OPPOSITION CANNOT RESUSCITATE THEIR CONSPIRACY CLAIM

The conspiracy count fails for the reasons articulated in the Investor Defendants' Reply.

## III.    PLAINTIFFS' OPPOSITION CANNOT RESUSCITATE THEIR NEGLIGENCE CLAIM

### A.    Plaintiffs Have No Answer For The Economic Loss Rule And *Xat.com*

Plaintiffs have no answer for Utah's economic loss rule, which squarely forecloses their negligence claim.  It is undisputed that Plaintiffs have alleged only economic losses and no harm to body or other property, which makes the first branch of the rule applicable.  *See* Op. at 21.

It is also undisputed the rule's second branch applies if the subject matter of the dispute is covered by contracts with Illusory.  Op. at 21–23.  Plaintiffs baldly assert that "no contract here displaces Plaintiffs' negligence claim" (Ill. Resp. at 13), which is wrong.   For Singh, Plaintiffs do not even attempt to argue that the TOU does not squarely cover his claims.  For Iagon, Plaintiffs omit that the License expressly governs the "*use*" of the Bridge's code, not just its "reproduction" and "distribution."  License § 1.  As alleged, Iagon *used* the Bridge's code to "set up a front-end interface" to transfer and store digital assets on the Bridge.  Changes to the code Iagon was *using* caused its injuries.  Contrary to Iagon's argument, although the License "contemplates that [Iagon] may contractually recover for [Illusory's] gross negligence," the "economic loss rule" nevertheless "prohibits [Iagon] from seeking recovery in tort" for "gross negligence."  *Xat.com*, 2017 WL 449652, at *6–7.  In any event, Plaintiffs allege ordinary, not gross, negligence.

Plaintiffs cannot establish an independent duty in this hack case, let alone one not already within the scope of the contracts, which defeats their tort claims, as *Xat.com* makes clear.  Their efforts to distinguish *Xat.com* (*see* Ill. Resp. at 15 n.7) are without merit.

*First*, as in *Xat.com*, the alleged losses here were purely monetary, which defeats Plaintiffs' effort to distinguish a "hack" of "proprietary software" from a hack of user funds.  *See* 2017 WL 449652, at *6–7.  Plaintiffs' lone case for the proposition that holding funds can nevertheless give

rise to an independent duty, *Bank of Com. v. Seely*, 23 Utah 2d 271, 273 (1969), is inapposite, as it neither addressed a negligence claim nor the economic loss rule. Indeed, the economic loss rule did not even "gain[] recognition in Utah outside of product liability cases" until 1996. *Donner*, 778 F.3d at 874 (rejecting relevance of prior cases).

*Second*, as in *Xat.com*, Plaintiffs do not allege a bailment relationship, as they do not allege they conferred on the Keyholders "the *authority* to limit" Plaintiffs' access to their assets—they in fact reached no agreement at all with the Keyholders. 2017 WL 449652, at *5. Nor could they plausibly allege a bailment relationship because they "routinely had access to [their assets]." *Id.*

*Third*, as in *Xat.com*, even if a bailment existed, the TOU and License "govern[] [the] possession of [plaintiff's] property," precluding any independent duty.[10] *Id.*; *see* Op. at 22.

*Finally*, as in *Xat.com*, even if there was a bailment outside the contracts, there still would be no independent duty because the parties are "sophisticated," "possess[ed] equal bargaining power" and had "the capacity to properly allocate risk through contract." *Id.*

Plaintiffs do not cite a single analogous Utah case finding an exception to the economic loss rule. Nor do they dispute that Utah applies a robust economic loss rule and is "generally unwilling . . . to expand the concept of an independent duty." Op. at 23. Instead, Plaintiffs cite out-of-state cases, which are distinguishable because they did not apply Utah law. *Donner*, 778 F.3d at 875 (rejecting relevance of out-of-state cases). Illustratively, they cite *In re Cap. One* to argue that Texas's economic loss rule would not bar a negligence claim for a data breach, but omit that the same court held that Washington's would. 488 F. Supp. 3d 374, 397, 401 (E.D. Va. 2020) (no duty "in the absence of 'clear Washington authority' suggesting otherwise"). Here, the clear

---

[10] A bailment relationship here would additionally defeat the negligence claim because the Keyholders, having received no fee, could only be gratuitous bailees, against whom ordinary negligence claims cannot lie. *See Ipsen v. Diamond Tree Experts, Inc.*, 2020 UT 30 ¶19 n.12.

authority in Utah demonstrates that the economic loss rule forecloses the claim.[11]

### B. Plaintiffs' Negligence *Per Se* Arguments Are Frivolous

Illusory's Reply (at 2–5) explains the countless reasons why Plaintiffs' negligence *per se* claim is frivolous and no statute imposes a duty. In brief, first, Plaintiffs have not alleged negligence *per se* at all. Second, Plaintiffs misrepresent *Hall v. Warren*, as they fail to bring to the Court's attention that "the *per se* rule [has been] modified to apply only in cases involving dangerous instrumentalities." 632 P.2d at 851 n.1. Third, among other reasons, Utah's money transmission statute cannot apply here because it expressly excludes "blockchain tokens" (*i.e.*, cryptocurrencies) from its ambit. U.C.A. § 7-25-102(9)(b). Finally, Utah courts do not find that statutes impose independent duties unless they provide for a "private right of action," and none of the cited statutes do. *Chinitz v. Ally Bank*, 2020 WL 1692817, at *5 (D. Utah Apr. 7, 2020).

### C. There Is No Duty Under Ordinary Negligence Principles

**No Direct Relationship.** Plaintiffs do not dispute that "[i]n the absence of a direct relationship, Utah courts have recognized an independent duty only when the defendant has incurred a fiduciary duty or an obligation to deal fairly and honestly under a statute or license." Op. at 24. Instead, they argue the test is satisfied because they allege the Keyholders took actions that affected them and their "crypto assets." Ill. Resp. at 9. That misconstrues the test, which asks whether the parties were in "contractual privity" or "communicated." *Se. Directional Drilling, LLC v. Kern River Gas Transmission Co.*, 2013 WL 209492, at *2–3 (D. Utah Jan. 17, 2013).

---

[11] Moreover, the bulk of the cases cited involved leaks of personally identifying information, which raise different policy concerns. The only cases involving cryptocurrency hacks are two from California, neither of which found that the plaintiff was bound by a contract and whose outcome may have been different if they had. *See Sarcuni v. bZx DAO*, 2023 WL 2657633, at *10 (S.D. Cal. Mar. 27, 2023) (rejecting argument that "negligence claim is barred by the Terms of Use" because the pleadings did not establish plaintiffs had agreed to the contract); *Fabian v. LeMahieu*, 2019 WL 4918431, at *10 (N.D. Cal. Oct. 4, 2019) (no contract pleaded).

Illustratively, *Donner* held that defendants' misrepresentations in marketing materials that plaintiffs reviewed—affirmative conduct that affected plaintiffs—were sufficient to give rise to an intentional misrepresentation claim but insufficient to give rise to a duty needed to support a negligence claim precisely because the parties had "no contractual relationship" and had "never dealt directly." 778 F.3d at 873. *Donner* defeats Plaintiffs' oblique suggestion that allegations of "affirmative conduct" can bypass the direct relationship requirement in a negligence economic loss rule case—which this case indisputably is under the rule's first branch. Plaintiffs' citations are inapposite: *B.R. ex rel. Jeffs v. West*, 2012 UT 11 and *Boynton v. Kennecott Utah Copper, LLC*, 2021 UT 67 are both bodily harm cases that do not implicate the economic loss rule.

As discussed *supra*, Plaintiffs have not alleged an obligation to deal fairly and honestly under a statute or license. And even if there were a bailment relationship, and even if it were not foreclosed by the relevant agreements, it would still not rise to the level of a fiduciary duty that imposes an independent duty. *See Xat.com*, 2017 WL 449652, at *5. The absence of a direct relationship is dispositive; the remaining factors confirm there is no duty.

**The Crux Of The Case Is Nonfeasance.** Try as they might to recast or outright invent new allegations, the crux of Plaintiffs' case is classic nonfeasance. *See* Op. at 24–25. Plaintiffs identify three purported affirmative acts. The first, "falsely promising users that Nomad Bridge offered exceptional security," is not alleged in the FAC, as Plaintiffs do not assert a negligent misrepresentation claim. The second, "introducing" the error into the code, is simply another way of stating Plaintiffs' core allegation of a failure to establish adequate security systems, *i.e.*, nonfeasance. The third, "failing to do anything about the" error, is clearly nonfeasance. Plaintiffs' case, *In re Target Corp.*, is distinguishable, as that case arose under Minnesota law and found a duty to protect against a data hack in light of a state statute "endors[ing]" the duty, which does not

14

exist here.  64 F. Supp. 3d 1304, 1308–10 (D. Minn. 2014).

**No Foreseeability.**  Despite Plaintiffs' assertion, there is no plausible allegation to explain how possessing a Key made the hack foreseeable.  Plaintiffs' argument that "the Keyholders—not Illusory—control the Bridge's basic functioning" is unsupported by the allegations and contradicted by the TOU, which is explicit that Illusory controls the Bridge.  *See* p. 10, *supra*.

**Risk Allocation Decisively Undercuts A Duty.**  There is no dispute that the hacker, Illusory, and Plaintiffs were better-positioned to avoid the harm.  *See* Op. at 25–26.  Plaintiffs ignore their own sophistication and that they had choices:  they chose to use the Bridge, a free, developmental product they knew to be inherently risky, rather than a finished product that came with a protective agreement and would likely charge a fee.  Likewise, Plaintiffs ignore that they had the opportunity to, and in fact did, allocate risk with Illusory, whereas the Keyholders had no such opportunity.  Under *Xat.com*, this factor alone is dispositive.  *See* p. 12, *supra*.

**Public Policy Disfavors A Duty.**  There is no serious dispute that public policy disfavors imposing a duty on the Keyholders, strangers to Plaintiffs that have had no opportunity to allocate risk.  *See* Op. at 26–28.  There is also no serious dispute that Plaintiffs are trying to evade the consequences of their contracts by suing the Keyholders, which would impose increased costs on Illusory if they are allowed to do so.  And Plaintiffs do not dispute that imposing a duty would paralyze the open-source industry and chill innovation.  Plaintiffs have failed to establish a duty.[12]

## IV.   THE OPPOSITION CANNOT RESUSCITATE THE CONVERSION CLAIMS

The conversion claim fails for the reasons articulated in Illusory's Reply (at 7–9).

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed with prejudice.

---

[12] Illusory's Reply (at 2–5) explains why breach and causation are not sufficiently alleged.

Dated:          September 13, 2023
               Wilmington, DE

OF COUNSEL:                                    **ABRAMS & BAYLISS LLP**

DONTZIN NAGY & FLEISSIG LLP                    */s/ Michael A. Barlow*
Tibor L. Nagy Jr.                              Michael A. Barlow (#3928)
Gregory N. Wolfe                               20 Montchanin Road, Suite 200
Matthew D. Gauthier                            Wilmington, DE 19807
980 Madison Avenue                             (302) 778-1000
New York, NY 10075                             barlow@abramsbayliss.com
(212) 717-2900
tibor@dnfllp.com
greg@dnfllp.com
mgauthier@dnfllp.com                           *Attorneys for ConsenSys Mesh*
                                               *and Ethereal Ventures I Partners L.P.*


OF COUNSEL:                                    **SHAW KELLER LLP**

COOLEY LLP                                     */s/ Karen E. Keller*
Bethany C. Lobo                                Karen E. Keller (No. 4489)
3 Embarcadero Center                           Emily S. DiBenedetto (No. 6779)
20th Floor                                     I.M. Pei Building
San Francisco, CA 94111                        1105 North Market Street, 12th Floor
(415) 693-2187                                 Wilmington, DE 19801
blobo@cooley.com                               (302) 298-0700
                                               kkeller@shawkeller.com
Rebecca L. Tarneja                             edibenedetto@shawkeller.com
355 S. Grand Avenue
Suite 900
Los Angeles, CA 90071
(213) 561-3225
rtarneja@cooley.com                            *Attorneys for Archetype Crypto II, LLC*

OF COUNSEL:

LATHAM & WATKINS LLP
Serrin Turner
Gregory Mortenson
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
serrin.turner@lw.com
gregory.mortenson@lw.com

Jack McNeily
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
jack.mcneily@lw.com

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Jeffrey L. Moyer*
Jeffrey L. Moyer (#3309)
Nathalie A. Freeman (#7053)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
freeman@rlf.com

*Attorneys for Connext Labs, Inc.*