IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MANNU SINGH and IAGON AS, on behalf of themselves and others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>ILLUSORY SYSTEMS, INC.; ARCHETYPE CRYPTO II, LLC; ETHEREAL VENTURES I PARTNERS L.P.; CONSENSYS MESH; CONNEXT LABS, INC.; COINBASE, INC.; OZONE NETWORKS, INC.; POLYCHAIN ALCHEMY, LLC; CIRCLE INTERNET FINANCIAL, LLC,<br><br>               Defendants. | C.A. No. 23-183-JLH |

## MEMORANDUM ORDER

Pending before the Court are four motions to dismiss Plaintiffs Mannu Singh and Iagon AS's First Amended Complaint (the "Complaint") under Rule 12(b)(6), as follows: (1) Defendant Illusory Systems, Inc. ("Illusory", and D.I. 56, "Illusory's Motion"); (2) Defendants Archetype Crypto II, LLC ("Archetype"), Connext Labs, Inc., Ethereal Ventures I Partners L.P. and ConsenSys Mesh (collectively, the "Keyholder Defendants", and D.I. 60, "the Keyholders Defendants' Motion"); (3) Circle Internet Financial, LLC ("Circle", and D.I. 58, "Circle's Motion"); and (4) Coinbase, Inc., Ozone Networks, Inc., and Polychain Alchemy, LLC (together with Circle, the "Investor Defendants" and D.I. 63, the "Investor Defendants' Motion"). The Motions have been fully briefed (D.I. 57, 59, 61, 64, 70, 71, 72, 75, 77, 78, 79) and I held argument

on January 17, 2024 (hereinafter, "Tr. ___"). For the following reasons, the Motions are GRANTED-IN-PART and DENIED-IN-PART.[1]

## I. BACKGROUND

In 2021, Illusory developed a cross-chain bridge (the "Nomad Bridge") to move crypto assets between blockchains. (D.I. 44 ¶¶ 25, 28). The Nomad Bridge is controlled by the holders of five cryptographic keys: Illusory holds two keys; and the Keyholder Defendants each hold one key. (*Id*. ¶¶ 2, 66). The Investor Defendants "agreed to provide funding, guidance, and advice to Illusory" as it developed the Nomad Bridge. (*Id*. ¶ 4). Circle also contributed code to a code repository by which "Nomad software was created and managed." (*Id*. ¶ 15).

While operational, the Nomad Bridge moved more than $912 million worth of crypto assets on behalf of more than 21,000 unique wallet addresses. (*Id*. ¶ 85). Mr. Singh, a crypto investor, used the Nomad Bridge several times in June and July 2022. (*Id*. ¶¶ 105, 106, 120). Iagon, a blockchain company that operates its own crypto-products, transferred a large number of its proprietary IAG tokens through the Nomad Bridge in April 2022. (*Id*. ¶¶ 106, 109, 120).

On June 21, 2022, a routine update was made to the Nomad Bridge that introduced a vulnerability to the system. (*Id*. ¶¶ 87–90). On August 1, 2022, an unidentified individual exploited that vulnerability to execute fraudulent transactions on the Nomad Bridge and stole a small amount of digital assets. (*Id*. ¶ 90). The next day, on August 2, 2022, an unidentified individual and various copycats initiated more fraudulent transfers on the Nomad Bridge and drained $186 million in crypto assets, allegedly including $172,000 of Mr. Singh's assets and

---

[1] The parties consented to my jurisdiction over these Motions, so I have resolved them in a Memorandum Order rather than a Report and Recommendation. (D.I. 87).

approximately $4.2 million of Iagon's assets. (*Id.* ¶¶ 1, 92–93, 108, 123). Illusory shut down the Nomad Bridge that day. (*Id.* ¶ 84).

To recover their losses resulting from the hack, Mr. Singh and Iagon initiated this class action asserting RICO claims under 18 U.S.C. § 1962(c) (Count One),[2] conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count Two),[3] and state law claims including negligence (Count Three),[4] conversion (Count Four),[5] and fraud (Count Five).[6] (*See generally id.*)

## II.  LEGAL STANDARD

In reviewing a motion filed under Rule 12(b)(6), the Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations omitted). A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). The complaint need not contain detailed factual allegations, but conclusory allegations and "formulaic recitation[s] of the elements of a cause of action" are insufficient to give the defendant fair notice of the nature of and grounds for the claim. *Twombly*, 550 U.S. at

---

[2] Iagon asserts Count One against Illusory, the Keyholder Defendants, and Circle. Mr. Singh asserts Count One "against the same Defendants other than Illusory Systems." (D.I. 44 at 31).
[3] Iagon asserts Count Two against Illusory, the Keyholder Defendants, Circle, and the Investor Defendants. Mr. Singh asserts Count Two against "all Defendants other than Illusory Systems." (D.I. 44 at 32).
[4] Iagon asserts Count Three against Illusory and the Keyholder Defendants. Mr. Singh asserts Count Three only against the Keyholder Defendants. (D.I. 44 at 33).
[5] Iagon asserts Count Four against Illusory and the Keyholder Defendants. Mr. Singh asserts Count Four only against the Keyholder Defendants. (D.I. 44 at 33).
[6] Iagon asserts Count Five against Illusory only, and Mr. Singh does not assert this claim. (D.I. 44 at 34).

555. The complaint must contain facts sufficient to show that a claim has "substantive plausibility." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam). While this plausibility standard requires more of the complaint than allegations supporting the mere possibility that the defendant is liable as alleged, plausibility should not be taken to mean probability. *Twombly*, 550 U.S. at 545. A claim is facially plausible, and the standard is satisfied, when the claim's factual allegations, accepted as true, allow the court to reasonably infer that the defendant is liable as alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 1948 (2009).

### III.   DISCUSSION

Defendants move to dismiss Plaintiffs' Complaint on multiple grounds. In sum, I dismiss Plaintiffs' substantive RICO claim under 18 U.S.C. § 1962(c) for lacking proximate causation; dismiss Plaintiffs' RICO conspiracy claims under 18 U.S.C. § 1962(d) because I dismissed the substantive RICO claims; and dismiss Plaintiffs' negligence and conversion claims as barred by Utah's economic loss rule. However, I will not dismiss Iagon's fraud claim against Illusory. Accordingly, Illusory's Motion is granted-in-part and denied-in-part, and the Keyholder Defendants' Motion, Circle's Motion, the Investor Defendants' Motion are granted.

#### A. Count One: Substantive RICO Claims Under 18 U.S.C. § 1962(c)

Defendants argue that Plaintiffs' RICO claims must be dismissed because, even construing the factual allegations in the Complaint in Plaintiffs' favor, non-racketeering acts led to Plaintiffs harm rather than any alleged RICO predicate acts. I agree.

To plead a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002) (internal citation and quotation marks omitted). "The statute defines racketeering by a list of criminal activities that constitute predicate acts for purposes of RICO,"

4

*id.*, which includes operating an unlicensed money transmitting business and wire fraud, *see* § 1961(1).

To have standing to bring a RICO claim, a plaintiff must show "(1) that he was injured (2) by reason of a violation of § 1962," which requires demonstrating "that . . . [he] was injured by an act that is independently wrongful under RICO, . . . and not merely by a non-racketeering act in furtherance of a broader RICO conspiracy." *Anderson v. Ayling*, 396 F.3d 265, 269 (3d Cir. 2005) (internal quotation marks and citation omitted). That is, a plaintiff must show that the defendant's "RICO violation was not only a 'but for' cause of his injury, but also that it was the proximate cause." *Id*. The proximate cause requirement means that the plaintiff's injury must be the "direct" result of an act of racketeering, *id*., rather than an attenuated harm following a "long chain of intervening causes." *Id*. at 270; *see also Gratz v. Ruggiero*, 822 F. App'x 78, 83 (3d Cir. 2020); *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300–01 (3d Cir. 2020); *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 644 (3d Cir. 2015); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 261 (3d Cir. 1999).

Here, a series of intervening, non-racketeering acts disrupts any potential causal relationship between Defendants' putative predicate acts (operating an unlicensed money transmitting business and wire fraud) and Plaintiffs' alleged injuries (Mr. Singh's $172,000 loss and Iagon's $4.2 million loss). The Complaint alleges that Illusory, Circle, and the Keyholder Defendants employed a coder who introduced a "simple mistake" or "vulnerability" into the Nomad Bridge's code that "allowed anyone who saw it to craft transactions to steal funds from the Nomad Bridge." (D.I. 44 ¶¶ 1, 87–89). Next, Plaintiffs say that an unknown "malicious actor began executing fraudulent transactions" using the vulnerability. (*Id*. ¶ 92). Then, non-party and unknown "copycats" replicated the fraudulent transactions, stealing additional assets on the

5

Nomad Bridge. (*Id.* ¶ 93). Finally, the Complaint pleads that, although "off-chain software agents" called "Watchers" could have voided these illegitimate transactions (*Id.* ¶ 50), they did not intervene. (*Id.* ¶¶ 61–65). Each of these intervening non-racketeering acts renders the injury too remote from Defendants' alleged wrongdoing—operating an unlicensed money transmitting business and wire fraud. *See, e.g.*, *Vavro v. Albers*, C.A. No. 05-321, 2006 WL 2547350, at *26 (W.D. Pa. Aug. 31, 2006), *aff'd sub nom. Vavro v. A.K. Steel Co.*, 254 F. App'x 134 (3d Cir. 2007) (concluding that "at least five intervening links between the alleged racketeering acts and alleged harm . . . clearly demonstrates that Plaintiff's claimed injury is indirect and remote."). Plaintiffs do not address these intervening causes in their submissions. Instead, Plaintiffs simply insist that their "out-of-pocket losses were the direct result of the RICO predicates Defendants committed." (D.I. 70 at 20). As pled, not so.

With respect to operating an unlicensed money transmitting business, Plaintiffs suggest that the mere existence of the "Nomad Enterprise" caused Plaintiffs' harms, pleading that the Nomad Bridge could operate "[o]nly by violating 18 U.S.C. § 1960" because "[h]ad the Nomad Enterprise sought a money-transmitting license to operate the bridge, it would almost certainly have been denied." (D.I. 44 ¶ 100) (*see also* D.I. 70 at 25) ("The Nomad Defendants' failure to apply for the required license thus led directly not only to Plaintiffs depositing their funds but also to a continued lack of proper oversight that likely would have prevented the unsophisticated hack that decimated the Nomad Bridge."). But beyond the broad assertion tethering Plaintiffs' harms to the existence of the "Nomad Enterprise," Plaintiffs do not directly link the lack of regulatory licensing (or its claim that the application for such might have been denied) to Plaintiffs' losses. For example, Plaintiffs do not explain how an improved compliance program would have prevented a coder from introducing a "simple mistake" into the Nomad Bridge's code and stopped

6

a "malicious actor" and "copycats" from exploiting that mistake. And Plaintiffs' argument that "proper oversight that likely would have prevented the unsophisticated hack" (D.I. 70 at 25) becomes even more speculative if I were to accept as plausible Plaintiffs' alternate theory that the "malicious actor" who introduced the vulnerability actually "worked on behalf of the Nomad Enterprise." (D.I. 44 ¶ 95). Although Plaintiffs' Answering Brief purports to describe specific licensing and compliance requirements set forth by the U.S. Department of Treasury and the state of New York, (D.I. 70 at 22–26), those unpled assertions lie outside the Complaint and may not be used to save Plaintiffs' claim. *See Com. Of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted). Even if I were to consider those assertions, Plaintiffs' theory speculates as to what government actors may or may not have required of Defendants had they been licensed. Such "speculati[on]" does not support Plaintiffs' RICO claim. *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 932 (3d Cir. 1999).[7]

With respect to wire fraud, Plaintiffs argue that "repeatedly encouraging users to deposit their funds on the Nomad Bridge through false promises of security" proximately caused Plaintiffs'

---

[7] Although Plaintiffs appear to tie proximate causation to foreseeability, that is not focus of the Court's inquiry in a RICO analysis. *Compare* D.I. 70 at 20 ("In short, Plaintiffs were the targets of Defendants' unlawful scheme, and their injury was an entirely foreseeable result of Defendants' scheme."); *Id.* at 23 ("The foreseeable consequence of the Nomad Enterprise's scheme to circumvent these rules was to deprive Plaintiffs of regulatory oversight that would have prevented the losses here."), *with St. Luke's*, 967 F.3d at 300 ("But unlike its more generic definition at common law, '[o]ur precedents make clear that in the RICO context, the focus [of proximate causation] is on the directness of the relationship between the conduct and the harm' rather than 'the concept of foreseeability.'" quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010)); *id.* ("[P]roximate causation is employed in civil RICO as a limiting principle intended to stymie a flood of litigation, reserving recovery for those who have been directly affected by a defendant's wrongdoing." citing *Holmes v. Sec. Inv'r Protection Corp.*, 503 U.S. 258, 268 (1992)).

losses because "false statements about a foreseeable assault on their system were made solely for the purpose of increasing their user base, which led directly to Plaintiffs' and the proposed class's losses." (D.I. 70 at 26; *see also id.* at 28 ("Absent Defendants' misrepresentations . . . about the impossibility of the very type of attack that cost the proposed class, Defendants' RICO enterprise would not have achieved its aims of running as much money as possible through their unlawful money-transmitting business.")). But accepting that argument would nevertheless require me to ignore, *inter alia*, the intervening error in code and thefts. That is, even if I were to accept as true that the allegedly false statements caused Plaintiffs to use the Nomad Bridge, that argument does not *directly* link allegedly false statements about security to Plaintiffs' losses arising from a vulnerability in code that led to the theft of their funds. As above, there are simply too many intervening events for Plaintiffs to be able to adequately show proximate cause on these facts, a conclusion buttressed by Plaintiffs' failure to address the impact of these intervening events. For example, Plaintiffs do not assert that Defendants promised there would never be error in code.

Accordingly, Count One is dismissed against Illusory, Circle, and the Keyholder Defendants.

### B. Count Two: RICO Conspiracy Claims Under 18 U.S.C. § 1962(d)

Defendants argue that dismissal of the substantive RICO claims requires dismissal of the RICO conspiracy claims under 18 U.S.C. § 1962(d). I agree. As Defendants point out, "when the pleadings do not state a substantive RICO claim, the RICO conspiracy claim must fail." *Hlista v. Safeguard Properties, LLC*, 649 F. App'x 217, 222 (3d Cir. 2016); *see also Ne. Revenue Servs., LLC v. Maps Indeed, Inc.*, 685 F. App'x 96, 102 (3d Cir. 2017) ("Because Northeast Revenue's substantive RICO claim fails as a matter of law, it follows that its conspiracy claim also fails."). Plaintiffs did not respond to Defendants' argument in their Answering Brief (D.I. 72), so I consider

Plaintiffs to have conceded the issue. *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 477–78 (D. Del. 2021). Count Two is dismissed against all Defendants.

### C. Count Three: Negligence

Illusory and the Keyholder Defendants contend that Plaintiffs' negligence claims are barred by Utah's economic loss rule. I agree.

Under Utah law, "[t]he economic loss rule prevents recovery of economic damages under a theory of tort liability when a contract covers the subject matter of the dispute." *Reighard v. Yates*, 285 P.3d 1168, 1174 (Utah 2012).[8] This rule applies even where the contract is between plaintiffs and a third party and in the "absence of privity of contract between the [plaintiffs] and the defendants." *Donner v. Nicklaus*, 778 F.3d 857, 872 n.6 (10th Cir. 2015). "[C]ourts have recognized exceptions to the economic loss rule where there exists an independent duty." *Ge-Prolec Transformers, Inc. v. Mountain States Transformer Serv., Inc.*, C.A. No. 23-290-TS, 2023 WL 7924805, at *1 (D. Utah Nov. 16, 2023). "Under the independent duty principle, if the plaintiff can point to separate duties—one in contract and one in tort—the economic loss rule does not bar a plaintiff's tort claims." *Xat.com Ltd. V. Hosting Servs., Inc.*, C.A. No. 16-00092-PMW, 2017 WL 449652, at *4 (D. Utah Feb. 2, 2017) (citing *Reighard*, 285 P.3d at 1174; *Hermansen v. Tasulis*, 48 P.3d 235, 240 (Utah 2002)). Where the tortious conduct "does not overlap" with the duties "contemplated in contract, 'the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.'" *Reighard*, 285 P.3d at 117 (quoting *Hermansen*, 48 P.3d at 240).

---

[8] Plaintiffs, Illusory, and the Keyholder Defendants cite to Utah law as governing Plaintiffs' negligence claim. (D.I. 57 at 7–10; D.I. 61 at 21–28; D.I. 71 at 4–13).

### 1. The TOU and License cover the subject matter of the dispute.

I must first determine whether the "subject matter" of Mr. Singh and Iagon's dispute—the alleged introduction of the error into the Nomad Bridge's code and subsequent hack—is governed by the agreements between Illusory and Plaintiffs. *Donner*, 778 F.3d at 872. Starting with Mr. Singh, the Keyholder Defendants[9] maintain that his use of the Nomad Bridge was subject to Illusory's Terms of Use (the "TOU") containing broad limitations of liability through which Mr. Singh acknowledged he was "access[ing]" and "us[ing]" the Nomad Bridge at his "sole risk", "AS IS", and that he could not recover "for any breach of security" or any hacks by third parties, including through "phishing," "bruteforcing," or "other means of attack against the" Nomad Bridge. (D.I. 61 at 22–23; D.I. 62-1, Ex. 1 (TOU)). In response, Mr. Singh does not address the TOU or its provisions at all.[10] Nor does Mr. Singh rebut the Keyholder Defendants' position that the TOU covers Mr. Singh's negligence claim such that he cannot recover in tort. (D.I. 61 at 22–23). Thus, I consider Mr. Singh to have conceded this issue, *Bench Walk*, 530 F. Supp. 3d at 478, and conclude that the TOU covers the subject matter of Mr. Singh's dispute with the Keyholder Defendants.

Turning to Iagon, Illusory and the Keyholder Defendants maintain that Iagon's use of the Nomad Bridge's code was subject to Illusory's "Apache License" (the "License"). (D.I. 57 at 10–11; D.I. 61 at 22–23; D.I. 62-1, Ex. 6 (License)). Iagon does not contest the License's validity or

---

[9] Mr. Singh does not assert a negligence claim against Illusory. (D.I. 44).

[10] This omission is telling because Plaintiffs' Answering Brief does address Iagon's License. (D.I. 71 at 14).

dispute that it is bound by it. Instead, Iagon argues that its negligence claims against Illusory and the Keyholder Defendants center on matters outside the License's scope. (D.I. 71 at 14).[11]

I disagree. Defendants characterize the License as merely a "copyright license" concerned with the "reproduction" and "distribution" of the Nomad Bridge code. (*Id*.). But the License covered Iagon's use as well. The License, titled "TERMS AND CONDITIONS FOR USE, REPRODUCTION, AND DISTRIBUTION," authorized Iagon to "reproduce", "distribute" and "modif[y]" the Nomad Bridge code. (License § 4 ("You may reproduce and distribute copies of the Work or Derivative Works thereof in any medium, with or without modifications, and in Source or Object form. . .")). In return, Iagon agreed that it was "solely responsible for determining the appropriateness of *using* or redistributing the Work and assume any risks associated with Your exercise of permissions under this License" and using the code on an "'AS IS' BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND . . ." (License § 7) (emphasis added). And Iagon agreed to broadly exculpate Illusory for Iagon's use:

> 8. Limitation of Liability.  In no event and under no legal theory, whether in tort (including negligence), contract, or otherwise, unless required by applicable law (such as deliberate and grossly negligent acts) or agreed to in writing, shall any Contributor be liable to You for damages, including any direct, indirect, special, incidental, or consequential damages of any character arising as a result of this License or out of the use or inability to use the Work (including but not limited to damages for loss of goodwill, work stoppage,

---

[11] All parties seem to agree that I may properly consider the TOU and License. (D.I. 6 n.4, 7 n.5). At the motion to dismiss stage, "[t]he court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, items subject to judicial notice, and matters of the public record." *Wise v. Biowish Techs., Inc*, C.A. No. 18-676-RGA, 2019 WL 4344273, at *2 (D. Del. Sept. 12, 2019) (citing *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)). Plaintiffs do not oppose such notice, or otherwise contend that the TOU or License are improperly considered at this stage in the litigation. I observe that Federal courts in Utah have dismissed claims as barred by the economic loss rule at the motion to dismiss stage. *See, e.g.*, *Ge-Prolec*, 2023 WL 7924805, at *2; *Xat.com*, 2017 WL 449652, at *4; *Salt Lake City Corp. v. ERM-W., Inc*., 984 F. Supp. 2d 1156 (D. Utah 2013). Because no party takes issue with my consideration of the TOU and License, neither do I.

computer failure or malfunction, or any and all other commercial damages or losses), even if such Contributor has been advised of the possibility of such damages.

(License § 8). The Complaint acknowledges Iagon's use of the code, pleading that "Iagon set up a front-end interface of its own through which its users could easily and seamlessly transfer IAG assets among chains." (D.I. 44 ¶ 121).[12] And the Complaint pleads that changes to the code that Iagon was using caused Iagon injuries. (*Id.* ¶ 172) ("In the alternative or additionally, the Nomad Defendants breached that duty by deploying defective software code in a manner lacking ordinary care or, in the alternative, employing someone who deployed defective software code in the scope of her employment in a manner lacking ordinary care."). Thus, Plaintiffs' argument that the License "has nothing to do with this action's subject-matter" (D.I. 71 at 14) is not persuasive, and I conclude that License covers the subject matter of Iagon's dispute with Illusory and the Keyholder Defendants.

### 2. Plaintiffs have not alleged an independent duty existing outside of the TOU or License.

I now turn to whether Illusory and the Keyholder Defendants owed Mr. Singh and Iagon an independent duty outside of Mr. Singh's TOU and Iagon's License. *Donner*, 778 F.3d at 872. Whether an independent duty exists is a "question of law" which involves the "examination of the legal relationships between the parties," "an analysis of the duties created by these relationships," and "policy judgments applied to relationships." *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 244 (Utah 2009) (quoting *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 286–87 (Utah 2006)). I conclude no such independent duty exists.

---

[12] Iagon does not refute Illusory's assertion that this allegation necessarily implies that Iagon used the Nomad Bridge's code. (D.I. 57 at 4).

Plaintiffs argue that Illusory and the Keyholder Defendants are subject to a "recognized independent duty of care" characterized as a "legal and moral duty to maintain [users'] funds intact" regardless of their contractual relationship with Plaintiffs. (D.I. 71 at 14) ("Put differently, even if Plaintiffs had not entered any contract with the Nomad Defendants, the Nomad Defendants would have a duty to exercise reasonable care to ensure the security of users' funds while on the Nomad Bridge."). But Plaintiffs' lone Utah case cited for the proposition that holding funds can give rise to an independent duty, *Bank of Commerce v. Seely*, was an action involving enforcement of a bank note and did not concern a negligence claim or the economic loss rule. 462 P.2d 154 (Utah 1969). As such, I do not find it compelling or controlling. Plaintiffs cite to no Utah authority finding an independent duty in the economic loss rule context under analogous circumstances. Nor do Plaintiffs dispute that "the Utah Supreme Court is generally unwilling to expand the concept of an independent duty in the context of the economic loss rule." (D.I. 61 at 23) (citing *In re Mountain W. Indus., LLC*, 592 B.R. 871, 881–82 (Bankr. D. Utah 2018)).

Further, Plaintiffs do not meaningfully distinguish contractual duties arising from Mr. Singh's TOU and Iagon's License, on the one hand, and an independent duty arising in tort, on the other. *Xat.com*, 2017 WL 449652, at *1 (explaining that a plaintiff must "point to separate duties—one in contract and one in tort" to avoid the economic loss rule's bar); *Hope Int'l Hospice, Inc. v. Net Health Sys., Inc.*, C.A. No. 22-00656-DBB-DBP, 2023 WL 2433642, at *4 (D. Utah Mar. 9, 2023) ("The economic loss rule bars the torts claims because they are not based on duties separate from the contract."). As I noted above, Plaintiffs do not address Mr. Singh's TOU. With respect to Iagon's License, Plaintiffs maintain that there no "overlap" between Iagon's claim and the License's contractual duties because the "Limitation of Liability" provision does not bear on Illusory or the Keyholder Defendants' "*own* conduct in operating the [Nomad] Bridge." (D.I. 71

13

at 14). But Plaintiffs' argument lacks textual support and would require me to override the License's plain language allocating all risk of *using* the code to Iagon. Such outcome would permit Iagon "to seek a remedy in tort in order to evade the contractual limitations on recovery." *See BMF Advance, LLC v. Litiscape, LLC*, 637 F. Supp. 3d 1272, 1287 (D. Utah 2022) ("The economic loss rule prevents a party from skirting the provisions of the governing agreement—including allocation of risk."). Had Iagon desired different terms governing its use of the code, Iagon could have bargained with Illusory for them. And although Iagon maintains that the License expressly excludes "deliberate and grossly negligent acts," Iagon asserts claims for ordinary, not gross, negligence. (D.I. 44 ¶¶ 169–73).[13]

The other factors considered by Utah courts militate against finding an independent duty. Utah courts have recognized an independent duty where one contracting party possesses "a high degree of knowledge and expertise" or where there exists a "disparity in skill and knowledge" between the contracting parties. *Davencourt*, 221 P.3d at 244. Here, Plaintiffs do not argue that either Mr. Singh or Iagon were unsophisticated parties lacking the capacity to properly allocate risk through contract. *cf. Xat.com*, 2017 WL 449652, at *6. Indeed, the Complaint undermines any argument that Plaintiffs lacked sophistication, pleading that Mr. Singh is a "Canadian crypto investor" who "uses bridges to maintain his investments in a low-cost, high-efficiency way" (D.I.

---

[13] At argument, Plaintiffs insisted that they alleged gross negligence with respect to Iagon. (Tr. 41:5–12 (citing D.I. 44 ¶ 94)). But I do not understand that sole allegation to transform Plaintiff's "Count Three: Negligence" into a gross negligence claim, which is governed by a different standard under Utah law. *See Ipsen v. Diamond Tree Experts, Inc.*, 466 P.3d 190, 195 (Utah 2020) ("Gross negligence is "the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result. . . although gross negligence differs only in degree from ordinary negligence, that difference in degree is large and matters").

44 ¶ 105) and that Iagon "operates a protocol allowing users to store large amounts of data across a distributed network of computers" and issues its own crypto asset (*Id*. ¶ 109).

Plaintiffs' argument in support of an independent duty for the Keyholder Defendants is even weaker. Utah courts have recognized that, "[i]n general, the more attenuated the relationship, the less likely a duty exists." *Donner*, 778 F.3d at 873 (citing *Yazd*, 143 P.3d at 286). Mr. Singh and Iagon have no contracts with the Keyholder Defendants (as Plaintiffs' maintain, Tr. 56:9–13), and there are no allegations in the Complaint that Mr. Singh or Iagon ever communicated directly with them.[14] Thus, "[i]n the absence of a direct relationship, Utah courts have recognized an independent duty only when the defendant has incurred a fiduciary duty or an obligation to deal fairly and honestly under a statute or license." *Donner*, 778 F.3d at 873 (collecting cases). Neither Mr. Singh nor Iagon have alleged a basis for imposing upon the Keyholder Defendants a fiduciary duty or an obligation arising out of a statute or license.[15]

---

[14] Accepting Plaintiffs' view that there is "no contract" at issue between Mr. Singh, Iagon, and the Keyholder Defendants, I alternatively dismiss Plaintiffs' negligence claims against the Keyholder Defendants because they have not alleged "physical damage to other property or bodily injury" to recover for their economic losses in negligence. *HealthBanc*, 435 P.3d at 196 ("The economic loss rule has two complementary yet distinct applications" and explaining that the first application applies when the parties have no contract and "bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury"). Instead, Plaintiffs argue that the first branch does not apply because Illusory and the Keyholder Defendants violated their "independent duties of care to Plaintiffs." (D.I. 71 at 15). But as discussed elsewhere in this Memorandum Opinion, Plaintiffs have not alleged the existence of any such independent duty.

[15] Plaintiffs maintain that the "Utah Supreme Court has long held that defendants "may be subject to a duty of care imposed by a statute or ordinance[,]" such that Illusory and the Keyholder Defendants' conduct constitutes negligence per se. (D.I. 71 at 4). But nowhere are the words "negligence per se" used in the Complaint. The Complaint neither identifies the applicable statute or ordinance nor alleges that such a statute or ordinance was violated by Illusory or the Keyholder Defendants' purportedly negligent conduct. *Child v. Gonda*, 972 P.2d 425, 432 (Utah 1998) (establishing elements of negligence per se). Although Plaintiffs' Answering Brief expands on these elements (D.I. 71 at 4–7), a party may not amend its complaint via an answering brief opposing a motion to dismiss. *Zimmerman*, 836 F.2d at 181. And Plaintiffs do not identify these statutes in the context of analyzing whether Illusory or the Keyholder Defendants had an

Finally, Plaintiffs argue that because Illusory and the Keyholder Defendants "exclusively controlled users' crypto assets while they were on the [Nomad Bridge]," that "difference is enough to establish an independent duty, particularly at the pleading stage." (D.I. 71 at 15 n. 7; Tr. 55:2–8 ("What, in fact, happened is that users gave their money to people that operate the NOSIS safe, Nomad governments. Those people possess that money, and they move it from one chain to another, and they continue to possess it. Possession is the key here under the state law claims. Under their cases and ours, it's true for both duty, economic loss, breach.")). I am not persuaded. Even if I were to assume that Illusory and the Keyholder Defendants were bailees of Mr. Singh's and Iagon's funds (a theory the Complaint does not plead) and that "possession" was not contemplated by the TOU or License (an argument Plaintiffs do not make), "the economic loss rule cannot be defeated by merely asserting there is a 'special relationship' between the contracting parties." *Xat.com*, 2017 WL 449652, at *5. Whether a duty exists "requires the court to understand the 'structure and dynamics of the relationship between the parties' and whether that relationship gives rise to a duty." *Id*. (quoting *Yazd*, 143 P.3d at 286–87). Here, Plaintiffs do not plead that they lacked equal bargaining power, that they weren't sophisticated, or that they lacked the ability to allocate risk. *Id*. at *5–6. Under these circumstances, allowing Plaintiffs to pursue a separate claim in tort "would effectively allow [Plaintiffs] to recover benefits [they] may have been unable to obtain through contract negotiations." *Id*. at *6. Count Three is dismissed against Illusory and the Keyholder Defendants.

---

independent duty to Plaintiffs. Thus, Plaintiffs' negligence per se theory does not save Count Three from dismissal.

### D. Count Four: Conversion

Illusory and the Keyholder Defendants argue that Plaintiffs' conversion claims are barred by Utah's economic loss rule. (D.I. 61 at 28; D.I. 57 at 16). Plaintiffs' sole argument in response is that, "[f]or the same reasons that Utah's economic-loss rule does not bar Plaintiffs' negligence claim, it does not bar their conversion claim either." (D.I. 71 at 19 n.8). Plaintiffs do not otherwise specifically or meaningfully dispute the economic loss rule's application to the conversion claims. Thus, Plaintiffs have waived any opposition to dismissal of their conversion claims on any unique grounds. Because I dismiss Plaintiffs' negligence claims as barred by the economic loss rule, I will also dismiss Plaintiffs' conversion claims as barred by the economic loss rule. *See Chinitz v. Ally Bank*, C.A. No. 19-00059, 2020 WL 1692817, at *4 (D. Utah Apr. 7, 2020) (dismissing conversion claim because the contract covered the subject matter of the dispute and plaintiff did not establish that defendant had a duty independent of the contract); *Hanks v. Anderson*, C.A. No. 19-00999-DBB-DAO, 2023 WL 4137327, at *9 (D. Utah June 22, 2023) (same).[16]

### E. Count Five: Fraud

Illusory argues that Iagon has not sufficiently pled a fraud claim because it has not alleged that Illusory made a false statement, that Iagon relied on any such false statements, and that Illusory made those statements with knowledge of their falsity and with intent to defraud Iagon. (D.I. 57 at 16–17). I disagree.

To state a fraud claim under Utah law, a plaintiff must plead: "(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the

---

[16] Plaintiffs, Illusory, the Keyholder Defendants all cite to Utah law as governing Plaintiffs' conversion claim. (D.I. 57 at 13–15; D.I. 61 at 28–30; D.I. 71 at 16–17).

representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage." *Fidelity Nat'l Title Ins. Co. v. Worthington*, 344 P.3d 156, 159 (Utah App. 2015).[17]

At this stage, Iagon has pleaded a fraud claim against Illusory. Iagon alleges that on March 4, 2022, Iagon CEO Navjit Dhaliwal spoke by videoconference with Illusory employee Mr. Pranay Mohan. (D.I. 44 ¶ 115). According to Iagon, Mr. Mohan told Mr. Dhaliwal "that the Nomad Bridge operators did not have control over the tokens in the bridge" and described the Nomad Bridge as "non custodial." (*Id.*) On April 21, 2022, Mr. Dhaliwal sent a message via Slack to Mr. Mohan:

> 1. Is the bridge thoroughly tested? 2. Where are the tokens that are bridged from Eth[ereum] being custodied? Who has the ownership of these assets? Corresponding security features. 3. How are the tokens on the Cardano side handled? Are these provided to the distribution utxos in bulk or in small quantities? How are these secured? What are the contingences in place in case of a security event?

(*Id.* ¶ 116). Mr. Mohan replied:

> 1. Yes it's been run in production for 4 months now, has been audited most recently in October 2021, and currently undergoing another full audit with Quantstamp (audit report will be ready in ~3 weeks time)[.] 2. They are escrowed in Nomad BridgeRouter contract on Ethereum . . . . a. Nobody has ownership, it is custodied by a smart contract[.] b. If the Updater tries to commit fraud and access these funds, Nomad Watchers will flag it and prevent the fraudulent transactions from going through (this is the optimistic security mechanism Nomad uses, and why we must wait 30 mins for confirmation)[.] 3. Not sure—question for [another developer], but I would also like to know the answer!

---

[17] Illusory cites to Utah law (D.I. 57 at 16) and Iagon does not dispute its application with respect to its fraud claim.

(*Id*. ¶ 117). With respect to Mr. Mohan's representation that "Nomad Watchers will flag it and prevent the fraudulent transactions," Iagon pleads that Mr. Mohan knew his answer was false because Illusory had not yet implemented those security features. (*Id*. ¶¶ 61–65, 82, 83). Iagon also pleads that Iagon acted in reliance upon Mr. Mohan's representation when it used the Nomad Bridge and "set up its front-end access point to the Nomad Bridge with Illusory Systems' ongoing help and cooperation." (*Id*. ¶¶ 121, 181, 182).

With respect to Mr. Mohan's representation regarding ownership of assets, although Mr. Mohan told Iagon that, "Nobody has ownership, it is custodied by a smart contract," Iagon pleads that Mr. Mohan knew his answer was false because "[a]nyone with the keys to that smart contract had 'ownership'" over the assets. (*Id*. ¶ 118). Illusory then pleads that Iagon relied on Mr. Mohan's representations that the Nomad Bridge was non-custodial

> because Iagon believed that it would have to report any third parties that possessed funds on behalf of users to the Norwegian government. As a recipient of government grants and incentives, Iagon is audited yearly and is required to account for transactions resulting in a change in custody of funds. In reliance on Mohan's false statements that the Nomad Bridge did not result in a change in custody of funds, Iagon felt comfortable using the bridge without seeking a record of the transaction—if Mohan's statements were true, Iagon would have remained in full custody of its own funds.

(*Id*. ¶ 119). Iagon pleads that, relying on Illusory's promises, Iagon transferred 500 million IAG tokens from Ethereum to Cardano on April 21, 2022 and "set up a front-end interface of its own through which its users could easily and seamlessly transfer IAG assets among chains." (*Id*. ¶¶ 120–21).

Illusory factually disputes what Mr. Mohan was attempting to convey with respect to custody of funds. Illusory also argues that any supposed reliance by Iagon was unreasonable, and that Iagon has not pleaded that Mr. Mohan made his comments with knowledge of their falsity.

19

(D.I. 57 at 17–20; D.I. 77 at 10). But to accept Illusory's arguments would require me to infer the Complaint in Illusory's favor, which runs afoul of the requirement at this stage to "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *Kedra v. Schroeter*, 876 F.3d 424, 434 (3d Cir. 2017) (quoting *Phillips*, 515 F.3d at 233). Thus, I will not dismiss Iagon's fraud claim at this stage.

### F. CONCLUSION

For the reasons set forth above, Defendants' Motions are GRANTED-IN-PART and DENIED-IN-PART as follows.

1. The Motions filed by Illusory, the Keyholder Defendants, and Circle to dismiss Plaintiffs' 18 U.S.C. § 1962(c) claims (Count One) are GRANTED.

2. The Motions filed by Illusory, the Keyholder Defendants, Circle, and the Investor Defendants to dismiss Plaintiffs' 18 U.S.C. § 1962(d) claims (Count Two) are GRANTED.

3. The Motions filed by Illusory and the Keyholder Defendants to dismiss Plaintiffs' negligence claims (Count Three) are GRANTED.

4. The Motions filed by Illusory and the Keyholder Defendants to dismiss Plaintiffs' conversion claims (Count Four) are GRANTED.

5. Illusory's Motion to dismiss Iagon's fraud claim (Count Five) is DENIED.

Dated: March 29, 2024

Hon. Laura D. Hatcher
United States Magistrate Judge